**UNITED STATES of America**

v.

**Melvin R. WADE, et al.**

**Civ. A. No. 79–1426.**

United States District Court,
E. D. Pennsylvania.

Sept. 7, 1982.

---

E.P.A., Region III, Philadelphia, Pa., for U.S.

Patrick T. Ryan, Cynthia J. Giles, John P. Kirwin, III, Philadelphia, Pa., for Congoleum Corp.

Bertram A. Stone, Chicago, Ill., Austin J. McGreal, Philadelphia, Pa., for Apollo Metals, Inc.

Calvin P. Sawyier, Edward J. Wendrow, Sidney Margolis, Chicago, Ill., James D. Wilder, Philadelphia, Pa., for Gould, Inc.

Henry S. Ruth, Jr., Scott D. Patterson, Michael C. Olmsted, Philadelphia, Pa., Frank J. Marcone, Media, Pa., for Sandvik, Inc.

Francis E. Marshall, Anthony P. Tinari, Michalisa Marshall Pugh, Philadelphia, Pa., for Superior Tube Co.

David Richman, John A. Guernsey, Philadelphia, Pa., for H. K. Porter Co.

Larry H. Slass, Philadelphia, Pa., as Trustee in Bankruptcy of ABM Disposal Service Co., Inc.

## MEMORANDUM

NEWCOMER, District Judge.

Before me is defendant Gould, Inc.'s motion to dismiss the amended complaint of plaintiff United States of America ["the government"] in this civil action brought under section 7003 of the Resource Conservation and Recovery Act[1] ["RCRA"] and section 106 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980[2] ["CERCLA"]. The government seeks to use these statutory injunctive relief provisions to impose liability upon defendant Gould and five other chemical companies for their past generation of hazardous chemical wastes which were subsequently disposed of upon a property located at 1 Flower Street, Chester, Pennsylvania ["the Wade site"].[3] The government seeks to recover from Gould and other off-site generators for expenses incurred, or to be

Peter F. Vaira, Jr., U.S. Atty., Gary Tilles, Asst. U.S. Atty., Philadelphia, Pa., James W. Moorman, Asst. Atty. Gen., Patrick J. Cafferty, Jr., Atty., Dept. of Justice, George Ray, Land & Natural Resources Environmental Enforcement Section, Washington, D.C., and Joseph J. C. Donovan,

1. 42 U.S.C. § 6973.

2. 42 U.S.C. § 9606.

3. Because all six generators are in the same position, I will treat Gould's motion as having been filed on behalf of all of them.

incurred, in planning and carrying out a clean-up of the Wade site. The other five generators are Apollo Metals, Inc., Congoleum Corporation, H. K. Porter Company, Inc., Sandvik Steel, Inc., and Superior Tube Company.

Congress has established, through CERCLA, funding and procedures for the Environmental Protection Agency ["EPA"] to use in order to clean up abandoned hazardous waste dump sites. Moreover, Congress has provided, through section 107[4] of that statute, a mechanism whereby the government can recover the costs of clean-up from the off-site generators whose wastes caused the pollution problem. Astonishingly, however, the government here has chosen to ignore those provisions of the statute which give it clear authority to remedy the pollution problem at the Wade site and recover its costs from Gould and the other off-site generators, and has instead chosen to sue under two different statutory provisions. I have discovered no case in which these provisions have ever been used to confer liability on past off-site generators, parties who generated hazardous wastes which were transported to a dump site by others. Because I conclude, on the basis of the statutory language, its context, and the legislative history, that past off-site generators are not proper defendants under the statutory provisions the government relies upon, and because these provisions do not authorize the type of relief the government seeks, the defendant's motion to dismiss the amended complaint against the generators is granted.

## FACTS

The Wade site has been used for disposal of hazardous chemical wastes for a period of time unspecified in the complaint. Generators of hazardous waste products, like Gould, contracted with the ABM Disposal Service (also a defendant in this suit but not involved in this motion) to have the substances drained into tank cars and drums. ABM then brought them to the Wade site and either stored the tanks or drums there, or emptied them directly onto the soil, through which they are currently draining into the Delaware River. On February 2, 1978, a fire broke out on the site which caused further damage to the several thousand drums and tank cars, which are now in a corroding, leaky and charred condition. After the fire, the Environmental Protection Agency (hereinafter "EPA"), in conjunction with the Pennsylvania Department of Environmental Resources, conducted tests on the site which demonstrated, the complaint alleges, that some fifty hazardous chemical substances are currently present in the soil. Some, like benzene, are toxic in themselves, and some, like decane, are potential fire hazards. Several small fires have in fact spontaneously ignited on the site since 1978. Water sampling conducted by the same agencies since 1978 indicates that some of the dangerous chemicals are currently migrating through the soil into the Delaware River.

The complaint alleges that Gould, among others, generated these substances and caused them to be brought to the site; that the substances are hazardous wastes under the definition in section 1004(5), (27) of RCRA[5], and that the current leaking of the chemicals into the soil and the water constitutes "disposal" which creates an "imminent...endangerment" to public health or the environment, so as to bring the site under the terms of the emergency injunctive relief provisions, section 7003 of RCRA and section 106(a) of CERCLA. The complaint does not allege that Gould is currently dumping waste on the site, that it was negligent in its past disposal, or that it has any current connection with the site.

The government filed suit against Gould when it amended its complaint for the second time on November 10, 1981 to include certain off-site generators of the hazardous wastes now on the Wade site. It sought an injunction forbidding any further dumping on the site and ordering Gould, among others, to "abate" the hazard by reimbursing the government for costs in-

---

**4.** 42 U.S.C. § 9607.

**5.** 42 U.S.C. § 6903(5), (27).

curred or to be incurred in planning and implementing a clean-up of the Wade site. Gould responded by filing the motion which is now before the Court to dismiss the complaint against it. Gould argues that section 7003 and section 106 do not impose liability on non-negligent past generators of hazardous waste who have no present connection with the dump site.

DISCUSSION

Upon a motion to dismiss brought under F.R.Civ.P. 12(b)(6), the facts alleged in the complaint must be taken as true. I accept, therefore, that as a result of past disposal of hazardous chemical wastes, dangerous chemicals are present in the soil on the Wade site and are currently being discharged into the atmosphere and into the Delaware River. I also accept as true that these discharges constitute an imminent and substantial endangerment to the public health and the environment (Amended Complaint, ¶¶ 35, 45) and that Gould and the others were generators of hazardous chemical wastes which were transported to the Wade site (¶ 46).

The question before me, therefore, is whether, as a matter of law, the statutory provisions relied on by the government confer substantive liability on non-negligent off-site generators of hazardous waste for past disposal of such waste which now creates an imminent hazard.[6]

The government argues that the "imminent hazard" authority created by section 7003 of RCRA and section 106(a) of CERCLA may be used not only to enjoin unsafe ongoing disposal of hazardous waste, but also to abate currently dangerous conditions resulting from unsafe past practices. Plaintiff's Memorandum at 13. Generation of hazardous waste, it further contends, constitutes an unsafe practice, and therefore off-site past generators like Gould are proper defendants under these emergency injunctive relief sections. Plaintiff's Memorandum at 11–12. While it is clear that Congress has provided EPA with a mechanism for cleaning up the Wade site and recouping its costs from generators such as Gould, my reading of the statutory language and the applicable legislative history compels me to conclude that non-negligent off-site generators of hazardous waste who are not currently dumping are not proper defendants under the particular provisions the government cites here.

Because I have concluded that Gould, Inc. is not a proper defendant under either section 7003 or section 106(a), I do not reach the defendant's additional argument that section 106(a) of CERCLA cannot be used against any defendant because the EPA has not yet complied with the statutory mandate to establish and publish guidelines for the use of its imminent hazard authority. See § 106(c) of CERCLA, 42 U.S.C. § 9606(c); Defendant's Memorandum at 10–11; Plaintiff's Memorandum at 33–37.

1. *Section 7003 of RCRA.*

■ Section 7003 is the emergency injunctive relief provision of the Resource Conservation and Recovery Act. Congress passed this legislation in 1976 to address the

---

**6.** The government contends at length (Plaintiff's Memorandum at 5–10) that section 7003 confers both jurisdictional authority and substantive liability. As the government notes, the courts which have considered this question are divided. *Compare United States v. Solvents Recovery Service,* 496 F.Supp. 1127 (D.Conn. 1980) *and United States v. Midwest Solvent Recovery, Inc.,* 484 F.Supp. 138 (N.D.Ind.1980) *and United States v. Ottati and Goss, Inc.,* No. 80–225 (D.N.H. Oct. 20, 1980) (section 7003 is jurisdictional only and does not confer substantive liability) *with United States v. Diamond Shamrock Corp.,* No. 80–1857 (N.D.Ohio May 29, 1981) (section 7003 confers substantive liability). *See also United States v. Charles Price,* 523 F.Supp. 1055 (D.N.J.1981); *United States v. Vertac Chemical Corp.,* 489 F.Supp. 870 (E.D.Ark.1980) (issue of substantive liability not specifically addressed in opinion but section 7003 used to confer substantive liability). The defendant here, however, has conceded that section 7003 may confer substantive liability (Defendant's Reply Memorandum at 2–3), and I will not address the issue in this Memorandum. The narrow question before me, therefore, is, assuming that section 7003 may be used to confer substantive liability, may it be used to confer such liability upon the defendants here, non-negligent off-site generators of hazardous chemical wastes.

growing national problem created by unsafe disposal of hazardous chemical waste.[7] The section authorizes the Administrator of the EPA "upon receipt of evidence that the handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment," to bring suit "to immediately restrain any person contributing to such storage, treatment, transportation or disposal...." 42 U.S.C. § 6973(a).

The parties differ chiefly on two points concerning the proper interpretation of section 7003. The first is whether the term "disposal" in the statute can be read to cover current leaking of waste from a dump site, so that the statute may be used to confer liability on those whose connection with the dump site was entirely in the past. The second is whether, even if the statute can apply to past acts, it can apply to the past acts of non-negligent off-site generators. I will address each point in turn.

The government argues first section 7003 may be applied to past acts which cause current "imminent hazards" and that ongoing or continuing dumping is not required for an action brought under the section. Plaintiff's Memorandum at 13. Several courts which have addressed this particular issue (although not in cases involving off-site generators) have agreed with the government's argument. *E.g., United States v. Price,* 523 F.Supp. 1055, 1071 (D.N. J.1981); *United States v. Diamond Sham-*

*rock Corp.,* No. 80–1857, slip. op. at 7–8 (N.D.Ohio, May 29, 1981); *United States v. Solvents Recovery Service,* 496 F.Supp. 1127, 139–42 (D.Conn.1980). These courts have stressed the statute's broad definition of the word "disposal," [8] and the legislative history of the 1980 amendments to RCRA.[9]

The opposing argument—that current leaking into the environment as the result of past unsafe disposal practices is *not* within the ambit of section 7003—also receives support from the statutory language and the legislative history. I note first that the section is written in the present tense and that the operative words are those which enable the administrator to bring suit "to stop" and "to immediately restrain" persons contributing to hazardous waste disposal. A straightforward reading of this language leads to the conclusion that its purpose is to allow the government readily to halt dangerous ongoing disposal practices. Moreover, even the broad definition of "disposal," relied on by those courts which have held section 7003 applicable to the results of past acts, seems to focus on the act of dumping itself as the "disposal" which may be enjoined, not the subsequent leaking of dumped waste from the dump site into the environment.

The Committee Reports also support the conclusion that the primary purpose of the statute as a whole, and section 7003 in particular, was to enable the government to identify, control and restrain current unsafe

---

7. RCRA, Public Law No. 94–580, was signed into law on October 21, 1976 as an amendment to the Solid Waste Disposal Act and was specifically designed to "eliminate[ ] the last remaining loop hole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes." H.R.Rep.No.1491, 94th Cong., 2d Sess. 4 (1976) *reprinted in* [1976] U.S.Code Cong. & Ad.News, at 6238, 6241.

8. The statute defines "disposal" to encompass "the discharge, deposit, injection, dumping, spilling, leaking, or placing" of any hazardous waste "on any land or water" in such a way that it may be discharged into the environment. 42 U.S.C. § 6903(3).

9. The 1980 amendments enlarged the authority of the EPA to use its imminent hazard authori-

ty from those situations in which the Administrator concluded that unsafe disposal "is presenting" a hazard, to those in which he concludes it "may present" a hazard. The change was intended, according to the House Committee Report, to enable the EPA to use section 7003 more vigorously to remedy the effects of past disposal practices which were not sound. The EPA was urged to use section 7003 to address the problem created by "abandoned sites as well as active ones." H.R.Rep. No.191, 96th Cong., 1st Sess. 4–5 (1979). I confess that I am somewhat puzzled as to how the particular linguistic change Congress made in the statute can be related to the "legislative intent," as it might be divined from the House Committee Report.

disposal practices. *See* H.R.Rep.No.1491, 94th Cong., 2d Sess. 69 (1976); S.Rep.No. 988, 94th Cong., 2d Sess. 16–17 (1976); Brenner, *Liability for Generators of Hazardous Waste,* 69 Geo.L.J. 1047, 1055 (1981). It was, in fact, the perceived inapplicability of RCRA, and particularly of section 7003, to the effects of past unsafe disposal practices that led to the 1980 CERCLA legislation that specifically addressed the problem of abandoned hazardous waste dumps.[10]

While I am inclined to the view that current leaking of previously dumped waste does not constitute "disposal" enjoinable under the clear language of section 7003, I need not resolve this issue in light of my conclusion that section 7003 may not, in any case, be used to confer liability on non-negligent past off-site generators of hazardous waste.[11] As the government concedes, no court has yet construed section 7003 to be applicable to past off-site generators. Plaintiff's Memorandum at 10. I believe this is because there is nothing in the statutory language or the legislative history that would authorize such a considerable extension of liability.

The government argues that since section 7003 grants the EPA authority to restrain "any person contributing" to the disposal of hazardous waste, it must therefore encompass "generators" since "[g]enerators are the first and perhaps the most important actors in the chain of events leading to the ultimate disposal of the waste." Plaintiff's Memorandum at 11.[12] There are, however, numerous other actors in this chain of events. Were I to accept the government's logic, I might be constrained to impose liability, through section 7003, upon the original manufacturers or miners of the chemicals which Gould uses in its manufacturing processes. Because there is no logical limit, given the breadth of the statutory language, to the number and type of persons who might be construed to be "contributing to" the disposal of hazardous waste, a court must look for clear legislative guidance before reading section 7003 to confer substantive liability upon so vast a class of potential defendants as off-site generators. There is no statutory definition of "a person contributing to" hazardous waste disposal. In the absence of Congressional guidance, it is not reasonable to define the term so broadly.

Furthermore, as the district court in *United States v. Midwest Solvent Recovery, Inc.* noted in the course of holding section 7003 to be only jurisdictional, "[a]ny provision that could logically be read so to expand the set of persons liable under the federal solid and hazardous waste regulatory scheme would surely be identified as such in the legislative history." 484 F.Supp. 138, 144 (N.D.Ind.1980). Yet, the fragmentary legislative history does not support the government's contention that Congress intended section 7003 to impose strict liability upon generators of hazardous waste. The original House and Senate reports on RCRA yield no sign of such an

---

**10.** *See* the testimony of Thomas C. Jorling, Assistant Administrator of the EPA, before the Joint Congressional Committee considering the problem of abandoned chemical dump sites, *Hazardous and Toxic Waste Disposal: Joint Hearings on S.1341 and S.1480 Before the Subcomm.'s on Environmental Pollution and Resource Protection of the Senate Comm. on Environmental and Public Works* (part 4), 96th Cong., 1st Sess. 7 (1979), *["Hazardous Waste Hearings"]*.

**11.** Gould has conceded that section 7003 may be used to restrain generators who are currently transporting hazardous waste in an unsafe manner. Defendant's Reply Memorandum at 3. The question here, therefore, is the narrow one of whether the section may be used to confer liability upon generators for past acts.

**12.** The government argues that by excluding past off-site generators from the scope of section 7003, one encourages generators to contract out of liability by simply arranging for others to transport their waste products. Plaintiff's Memorandum at 12. While it is true that the statutory scheme of RCRA, which clearly separates both the duties and potential liability of dump site owners from those of generators, gives generators some incentive to contract with others for waste disposal rather than handling it themselves, this nevertheless is the scheme which Congress has enacted. *See* Brenner, *Hazardous Waste Disposal,* 69 Geo.L.J. 1047, 1052–53 (1981).

intent. *See* H.R.Rep.No.1491, 94th Cong., 2nd Sess. 69 (1976); S.Rep.No.988, 94th Cong., 2nd Sess. 16–17 (1976).[13]

The one faint hint of a congressional intent to impose liability on former generators in the legislative history of the 1980 amendments to section 7003 is in a committee print of a House subcommittee. Subcomm. on Oversight and Investigations of House Comm. on Interstate and Foreign Commerce, 96th Cong., 1st Sess., Report on Hazardous Waste Disposal (Comm. Print 1979) ["the Eckhardt Report"]. The subcommittee suggested that "a company that generates hazardous waste would be someone 'contributing to' an endangerment under § 7003, even where someone else deposited the waste in an improper disposal site (similar to strict liability under common law)."[14] The Eckhardt Report at 31. However, the full Senate Committee Report, which accompanied the bill to the Senate floor, discarded the strict liability approach and suggested instead that a negligence standard would apply to past generators.[15] Because the complaint alleges no actual knowledge or negligence on Gould's part, even were I to accept the cryptic reference in the report of the full Senate Committee as conclusive evidence of Congressional intent to impose liability on negligent generators, section 7003 would still not be applicable to a non-negligent off-site generator such as Gould. More fundamentally, a court may not base a decision to impose liability on such a potentially vast group of defendants as off-site generators

of hazardous waste on the basis of the conflicting and fragmentary legislative history of section 7003. *See United States v. Midwest Solvent Recovery, Inc.,* 484 F.Supp. 138, 143–44 (N.D.Ind.1980).

The structure of the RCRA, and the EPA's own regulations governing the statute's implementation, support my conclusion that off-site generators are not proper defendants under section 7003. The statute clearly separates the duties imposed upon generators from those of dump site owners. A generator's responsibilities are codified in 42 U.S.C. § 6922, which imposes liability for failure to comply with the section's reporting, labeling and packaging requirements. The applicable EPA regulations relating to generators clearly follow the statutory scheme and are contained in 40 C.F.R. § 262 (1981). By way of contrast, the sole reference in these regulations to section 7003 comes in 40 C.F.R. § 264 (1981), which is entirely devoted to elaborating on the statutory provision relating to "Owners and Operators" of hazardous waste dumps, 42 U.S.C. § 6924. *See* 40 C.F.R. § 264.4 (1981). EPA clearly stated its view as to when section 7003 would be applicable when it first proposed the regulations in 1978: the section was to be "available only against the present owner of the land on which an inactive site is located. . . . Using Section 7003, EPA can sue the owner of an inactive facility which is discharging a hazardous waste into the air, land, or water. . . ." 43 Fed.Reg. 58,984.[16]

---

**13.** When considering the 1980 amendments to RCRA, the House Committee on Interstate and Foreign Commerce noted that the problem of abandoned hazardous waste disposal sites was a "new issue" which was "not evident in 1976." H.R.Rep.No.191, 96th Cong., 1st Sess. 4 (1979).

**14.** The government has misattributed this quotation to the report of the full Committee on Interstate and Foreign Commerce. Plaintiff's Memorandum at 15.

**15.** The full Senate Committee reproduced the House Subcommittee language cited above, but added the qualifying phrase, "where the generator had knowledge of the illicit disposal or failed to exercise due care in selecting or instructing the entity actually conducting the disposal." S.Rep.No.172, 96th Cong., 1st Sess. 5

(1979), U.S.Code Cong. & Admin.News 1980, pp. 5019, 5023.

**16.** In the 1978 proposed regulations the discussion of section 7003 comes within the body of Subpart D which relates to owners and operators, and not within Subpart B which discusses generators. In fact, the regulations clearly state, "the manifest system established in Subpart B regulations comes to a close when manifested hazardous waste is received by a treatment, storage or disposal facility." 43 Fed.Reg. 58,984. The proposed regulations urged that section 7003's imminent hazard authority be used more vigorously to reach the problem of inactive hazardous waste sites, a call that was echoed five months later in the House Committee's Report on the 1980 amendments to sec-

The inapplicability of section 7003 to the present case is also demonstrated by the type of relief for which the government prays. Since the complaint does not allege that any of the generators is currently disposing of waste on the Wade site or that there is any threat that they will resume their past practice of doing so, I cannot sensibly grant the government's prayer that they be permanently restrained from doing so. The government's essential request, therefore, is contained in paragraphs three and four of the prayer for relief, in which the Court is asked to "enjoin" the defendant among others, to pay the cost of drawing up and implementing a plan to clean up the Wade site. I am also asked to require the defendant to reimburse the government for expenses already incurred toward this end. Since Gould is no longer dumping on the site and is not the owner of the property, it cannot comply with any such injunction except by paying money. The government's prayer for relief, though phrased in injunctive terms, is transparently a prayer for money damages. The Third Circuit recently ruled, however, that "[a] plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money." *Jaffee v. United States,* 592 F.2d 712, 715 (3rd Cir. 1979), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). In *U.S. v. Price,* the court faced a similar question, in that the government sought a preliminary injunction under section 7003 which would order the defendant to pay for a study which would determine the ultimate cost of cleaning up the site. "We entirely agree that a thorough study of the problem is essential and should be done immediately," the court commented. "Nonetheless, an order compelling defendants to fund such a study would not be an appropriate form of preliminary injunctive relief." *U.S. v. Price,* 523 F.Supp. 1055, 1067 (D.N.J. 1981) (Brotman, J.).

A finding that section 7003's imminent hazard authority is inapplicable to non-negligent past generators accords with a straightforward reading of the statutory language, the legislative history and the EPA's own regulations. Not surprisingly, no court, as far as I am aware, has construed section 7003 to be applicable to generators. They have limited the section's applicability to owners of sites with power to comply with an injunction.[17] *United States v. Vertac Chemical Corp.,* 489 F.Supp. 870 (E.D.Ark.1980); *United States v. Midwest Solvents Recovery Services, Inc.,* 484 F.Supp. 138 (N.D.Ind.1981).

### 2. *Section 106(a) of CERCLA.*

■ The government's second statutory claim, under section 106 of CERCLA, or "Superfund," must also fail. Because CERCLA is so new and has not as yet been construed by any court,[18] the government urges that I analogize section 106, the emergency injunctive relief section of CERCLA, to section 7003. Plaintiff's Memorandum at 22–26. Given my analysis of section 7003, *supra,* such an analogy would not avail the government.

CERCLA was specifically designed to plug gaps in the government's then existing anti-pollution program. In particular, it was designed to deal squarely with the problem of abandoned or "orphan" hazardous waste dumps, a problem which RCRA had not adequately addressed. H.R.Rep. No.1016, 96th Cong., 2d Sess. 25 (1980); S.R.Rep.No.848, 96th Cong., 2d Sess. 11

tion 7003. H.R.Rep.No.96–191, 96th Cong. 1st Sess. 4 (1979). The EPA regulations, however, made clear that the more vigorous use of the section was directed against site owners rather than against generators.

**17.** The farthest a court has yet stretched the section has been to apply it to the negligent former owner of a site, because his negligence had "contributed to" current water seepage. *U.S. v. Price,* 523 F.Supp. 1055 (D.N.J.1981).

**18.** Since the government filed its Memorandum, it is likely that one or more district courts around the country have faced the problem of construing CERCLA in as-yet unpublished opinions. *See, e.g., City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135 at 1140–1144 (E.D.Pa.1982) (Ditter, J.) (construing section 107 of CERCLA and discussing legislative history of the Superfund legislation).

(1980), U.S.Code Cong. & Admin.News 1980, p. 6119.[19] The method chosen by Congress was the creation of a revolving "Superfund," which was to be funded by a tax on generators of hazardous waste products. The heart of the statute is contained in section 104, "Response Authorities," which gives the EPA the authority to undertake emergency clean-up measures when it determines that an abandoned site presents, or may present "an imminent and substantial danger to public health." 42 U.S.C. § 9604. Congress intended section 104 to work in tandem with section 107, the liability section. H.R.Rep.No.1016, Part 1, 96th Cong., 2d Sess. 33. By the terms of section 107, the government is authorized to sue designated classes of persons to reimburse the Superfund for emergency clean-up, removal and containment actions which it undertook under section 104.[20] Section 107

clearly includes generators of hazardous waste among those potentially liable to be sued for clean-up costs incurred under section 104. Moreover, the provision which applies to generators is written in the past tense and clearly applies to past generators and transporters.[21] Had the government, therefore, undertaken to clean up the site under section 104, and then proceeded against Gould under section 107, the statutory authority to support such actions would have been clear.

The government has, however, ignored sections 104 and 107 and chosen instead to proceed under section 106(a) of CERCLA, which confers upon the EPA the authority to seek emergency injunctive relief when presented with evidence of an "imminent and substantial endangerment to the public health."[22] 42 U.S.C. § 9606. The government argues that because Congress intend-

19. The enactment of "Superfund" was preceded by lengthy Congressional hearings into the infamous abandoned chemical waste dump at Love Canal, near Niagara Falls, New York. *Hazardous Waste Hearings,* note 8, *supra.*

20. The purpose of the legislation and the method chosen to implement it is clearly set out in H.R.Rep.No.96–1016, Part 1 at 17, U.S.Code Cong. & Admin.News 1980, p. 6119:
The reported bill would amend the Solid Waste Disposal Act to provide for a national inventory of inactive hazardous waste sites and to establish a program for appropriate environmental response action to protect public health and the environment from the dangers posed by such sites. The bill would provide authorities to the Administrator of the Environmental Protection Agency to take emergency assistance and containment actions with respect to such sites and establish a $600 million, 4-year Hazardous Waste Response Fund to be drawn in equal amounts from industry-based fees and Federal appropriations, to finance such actions undertaken by the Administrator. The legislation would also establish a Federal cause of action in strict liability to enable the Administrator to pursue rapid recovery of the costs incurred for the costs of such actions undertaken by him from persons liable therefor and to induce such persons voluntarily to pursue appropriate environmental response actions with respect to inactive hazardous waste sites.

21. Section 107 confers liability upon "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or

treatment, of hazardous substances owned or possessed by such person...." 42 U.S.C. § 9607(a)(3). The House and Senate Reports echo the clear legislative intent to impose strict liability on generators. *See* S.Rep.No.848, 96th Cong., 2d Sess. 13; H.Rep.No.1016, Part 1, 96th Cong., 2d Sess. 33–34. *But see* Brenner, *Liability for Generators of Hazardous Waste,* 69 Geo. L.J. 1047, 1057 (1981), noting that the final bill was a compromise which was silent on the subject of strict generator liability.

22. The government does not, in its memorandum, straightforwardly state the reason it has chosen to proceed via section 106 of CERCLA. A reason may be that the Superfund, as enacted, is inadequate to address the enormous public health problem posed in our country by abandoned or inactive hazardous waste sites. When describing the scope of the problem before the Joint Committee which considered CERCLA, EPA Assistant Administrator Thomas C. Jorling stated that approximately 1–2000 of the 30–50,000 waste disposal sites in the U.S. pose potential threats to public health or the local environment. He estimated that 26–44 billion dollars would be needed to clean up these potentially dangerous sites. *Hazardous Waste Hearings,* note 6, *supra,* at 37–38.
The original Senate Superfund bill (S.1480 § 5) provided for a $4.085 billion fund, while the original House Committee bill (H.R. 7020) would have provided $600,000 (later increased to $1.2 billion on the House floor). S.Rep.No. 848, 96th Cong., 2d Sess. 69 (1980); H.R.Rep. No.1016, part 2, 96th Cong., 2d Sess. 62 (1980); 126 Cong.Rec. H9443,9473,9475 (daily ed. Sept. 23, 1980). As enacted, the Superfund was a

ed past off-site generators to be liable under the statutory scheme established by sections 104 and 107, it must also have intended that they be liable under the emergency injunctive relief authority of section 106. Plaintiff's Memorandum at 32. In the absence of any evidence that Congress intended section 106 to be used in this way, and in face of the clear and carefully detailed legislative provision of another route to the same result, I cannot agree with the government's contention.

The language of section 106 gives no hint of an intent to confer liability on past generators. Like section 7003 of RCRA, and, significantly, unlike section 107, it is written in the present tense. It authorizes the government to seek immediate injunctive relief because of "an actual or threatened release of a hazardous substance from a facility...." It authorizes the EPA to supplement any action undertaken by a local government to meet this imminent hazard, and "to secure such relief as may be necessary to abate such danger or threat...." 42 U.S.C. § 9606(a). A straightforward reading of this language requires that I conclude that Congress intended section 106(a) to be used in emergency situations where hazardous waste was currently being discharged or threatened to be discharged "from a facility" [23] and where such discharge could be stopped by an injunction. Such a reading of section 106 as applicable to current emergencies where responsible parties may be ordered to comply with an injunction renders the sec-

tion a complement to section 104 and 107 which are so clearly addressed to the present health problems caused by abandoned sites.

The government argues, however, that a "harmonious" reading of the statute requires a conclusion that section 106 provides an alternative route through which the EPA may, at its option, address the problem of abandoned sites. Plaintiff's Memorandum at 28. The "harmonious" reading for which the government contends will be better achieved, this Court believes, by acknowledging that Congress intended each provision to serve a specific purpose in this extensively debated legislative program. Where Congress after extensive debate, has clearly designated its choice of a method for obtaining money damages from past off-site generators whose waste products have contributed to the critical problem posed by abandoned chemical dumps, it is the role of EPA and this Court to carry out the unambiguous legislative intent. *See U.S. v. Burns*, 512 F.Supp. 916 (W.D.Pa.1981) (where Congress designated the Clean Water Act as the government's exclusive means of recovering clean-up costs for certain hazardous wastes, the government could not seek an alternative statutory means of reimbursement).

An appropriate order will be entered.[24]

compromise bill, closer to the House version ($1.6 billion) and clearly inadequate to remedy the problem as the EPA testimony described it. *See* Brenner, *Liability for Generators of Hazardous Waste,* 69 Geo.L.J. 1047, 1057 (1981). *See generally* Grad, *A Legislative History of CERCLA of 1980,* 8 Colum.J.Envtl.L. 1 (1982). While this Court is aware of the dimension and seriousness of the problem which CERCLA addresses, Congress, and not this Court must legislate a remedy adequate to the scope of the problem.

**23.** Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), defines "facility" quite broadly to include both "building, structure, installation" as well as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed...." The Wade site is unques-

tionably a facility under the statutory definition, and I must reject defendant's argument which seeks to limit the phrase's applicability.

**24.** As this Memorandum was undergoing final revisions, I received the government's motion for leave to file a third amended complaint under the provisions I have suggested herein they should have used in the first place, sections 104 and 107 of CERCLA. Decision on the motion for leave to amend must, of course, await expiration of the time provided for defendants to file responses. I add this footnote simply to make it clear that nothing in this Memorandum is intended as a comment on the merits of the government's motion for leave to amend.