## INDUSTRIAL PARK DEVELOPMENT COMPANY

v.

## The ENVIRONMENTAL PROTECTION AGENCY, an agency of the United States of America; and Lee M. Thomas, in his capacity as the Administrator of the Environmental Protection Agency; and Stanley L. Laskowski, in his capacity as the Acting Regional Administrator for the Environmental Protection Agency Region III.

### Civ. A. No. 85–0875.

United States District Court, E.D. Pennsylvania.

March 21, 1985.

Denis V. Brenan, Frank M. Thomas, Jr., William F. Mongan, Philadelphia, Pa., for plaintiff.

Michael L. Martinez, Asst. U.S. Atty., Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

SHAPIRO, District Judge.

Plaintiff Industrial Park Development Company ("IPDC") sought injunctive relief to prevent Environmental Protection Agency ("EPA") access to IPDC's property to remove hazardous waste materials under the presumed authority of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*

Following a hearing on February 21 and 22, 1985, for reasons stated from the bench, the court denied plaintiff preliminary injunctive relief (because there was no showing of irreparable harm) but retained jurisdiction to consider the merits of this litigation on an expedited basis. This Memorandum is an elaboration of the court's bench opinion.

IPDC, a limited partnership, owns a 5.5-acre tract of undeveloped land in Eddystone, Pennsylvania (the "site"). During the 1970's the site leased to ABM Trucking Company, Inc. ("ABM"). Some time after ABM's lease terminated, EPA discovered on the site drums (55-gallon capacity) and cans (½ pint to 5-gallon capacity) containing waste materials as well as a tank truck containing approximately 1,000 gallons of sludge. Since termination of ABM's lease, IPDC has not leased this property and has no present plans either to lease or develop the vacant site.

In August, 1983, EPA inspected the site and took samples of the contents of some drums and surrounding soil. In October, *1984*, results of the chemical analyses of these samples revealed the presence of substances termed hazardous under CERCLA, § 101(14), 42 U.S.C. § 9601(14).[1] EPA then conducted site inspections and determined that these substances posed a significant and imminent environmental threat. At that time, EPA estimated the area of concern for container removal and soil decontamination as 1.1 acres.

On December 12, 1984, Thomas P. Eichler, the former EPA Regional Administrator for Region III, issued an order pursuant to CERCLA § 106, 42 U.S.C. § 9606 ("Section 106 Order"), directing IPDC to submit and implement a plan for IPDC action[2] to clean up the site. Section 106 provides that where the President determines that there may be "imminent and substantial" danger to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance, he may require the Attorney General to secure equitable relief in federal court to abate such danger or threat. The President[3] may also, after notifying the

1. Because the Government did not present its case, it offered no proof that the substances found on the site (including Trichloroethylene, lead, mercury, arsenic, chromium, carbon tetrachloride, chlorinated hydrocarbons, benzene derivatives, isophorene, N-nitrosodiphenylamine, bis (2-ethylhdyl phthalate) are on the list of hazardous substances as defined by 42 U.S.C. § 9601(14). But IPDC did not contest the description of these substances as hazardous and argued only that they did not pose an imminent threat.

2. Because CERCLA has been interpreted to impose strict liability on any party legally responsible for a site, *see City of Philadelphia v. Stepan Chemical Company*, 544 F.Supp. 1135, 1140

(E.D.Pa.1982), IPDC was held responsible although IPDC has never been accused of creating or contributing to the hazardous waste found there. But ABM (the lessee) has been often accused of responsibility for the presence of hazardous waste materials. *See United States v. Wade*, 546 F.Supp. 785 (E.D.Pa.1982) (ABM storing hazardous chemical waste products on Wade site); *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135 (E.D.Pa.1982) (finding ABM was illegally dumping hazardous waste and noting that the President of ABM was a fugitive from justice).

3. Section 106 grants this authority to the President. It is undisputed that these Presidential powers were delegated to the EPA Administra-

affected state, issue orders requiring action by private responsible parties to protect public health and welfare and the environment. Removal actions involve the clean-up and disposal of released hazardous substances from the environment. Remedial actions involve preventing or minimizing the threatened release of hazardous substances into the environment. In this instance, the Attorney General did not seek a court injunction but the EPA issued the Section 106 Order.

This Section 106 Order also provided that if the EPA On-Site Coordinator ("OSC") determined that IPDC was in non-compliance with the Order, EPA could have access to the site "at all reasonable times, to undertake such measures in lieu of the Respondent [IPDC], and to take any other measures which the OSC determines may be necessary to protect public health, welfare, or the environment." December 12, 1984 Section 106 Order, ¶ 25. Authority for this power to enter private property was presumed by EPA to be found in CERCLA § 104, 42 U.S.C. § 9604(a)(1), which provides, "the President is authorized to act [to remove hazardous substances] unless the President determines that such removal and remedial action will be done properly by the owner or operator of the vessel or facility from which the release or threat of release emanates, or by any other responsible party." Any response action pursuant to CERCLA must be carried out in accordance with that portion of the National Contingency Plan, 42 U.S.C. § 9605, approved through agency rule-making procedures and found at 42 CFR 300.1 et seq., providing for the identifying, removing or remedying releases of hazardous substances. Such response actions are fi-

nanced by the Hazardous Substance Response Fund ("Superfund"), 42 U.S.C. § 9631.

CERCLA does not provide for a court or administrative hearing prior to the issuance of a Section 106 Order nor did ¶ 25 of the Order provide for a hearing to permit EPA access to the site for any purpose. The costs of an EPA clean-up, as well as punitive fines, may be recovered from a responsible party by federal court action. 42 U.S.C. § 9607.[4] According to the defendant, this extraordinary power was legitimately delegated to the EPA Administrator, then the Regional Administrators, and finally to any EPA OSC.

IPDC did not agree to be bound by the terms and conditions of this Order. But IPDC nonetheless engaged an independent consultant, Resource Technology Services, Inc. ("RTS"), to prepare a work plan and carry out activities under that plan for the removal of wastes from the site. On December 18, 1984, IPDC submitted the RTS plan to the EPA OSC. This plan divided the waste removal action into Phase I activities (site stabilization, container sampling, and preliminary sample analysis) and Phase II activities (waste removal and disposal, and any necessary soil sampling, analysis and disposal). The RTS plan included a list of approved disposal facilities regularly utilized by RTS. The OSC orally approved this plan on December 18, 1984 and confirmed this approval in writing on January 3, 1984. The OSC was also on the site to observe and monitor Phase I compliance. RTS completed Phase I[5] on January 2, 1985 at a cost to IPDC of $133,000.

IPDC submitted RTS's Phase II plan to EPA on January 24, 1985. The OSC requested a meeting to review several as-

---

tor and that he redelegated this authority to Regional Administrators, see Executive Order No. 12316, March 14, 1981, 40 CFR 300.21, but the legitimacy of this delegation is at issue.

**4.** Under CERCLA, a responsible party ordered under Section 106 to clean up a hazardous waste site may be fined up to $5,000 per day for failure to comply. 42 U.S.C. § 9606(b). 'If EPA acts under Section 104 to undertake its own clean-up, the responsible party may be liable for

costs of the clean-up and punitive damages up to three times the amount of the clean-up cost incurred by EPA. 42 U.S.C. § 9607(c)(3).

**5.** According to the OSC's Affidavit and testimony (he was called as a hostile witness by IPDC), he found several aspects of Phase I not completed: proper development of drum staging area, repackaging of drums, and containerization of visually contaminated soil. IPDC challenges this assessment.

pects of the plan unsatisfactory to him. In particular, the OSC objected to the proposed timetable and to scheduling a Phase III (instead of completing the removal response by Phase II). At this February 6, 1985 meeting, the OSC demanded that IPDC revise the plan by the next day. IPDC complied with this demand and submitted a revised plan on February 7, 1985. The OSC objected to the February 7 plan on essentially the same grounds as the prior plan (OSC Affidavit, ¶ 15). At that time, the OSC advised IPDC that EPA would undertake its own clean-up response on February 11, 1985, if IPDC did not submit an acceptable plan promptly. He secured the services of O.H. Materials, under government contract for this purpose.

IPDC was permitted several brief extensions (until February 9, 1985, then February 11, 1985, then February 12, 1985) to submit a revised plan. On February 9, 1985 the OSC advised IPDC that the revised plan would have to, *inter alia,* conclude the clean up by March 2, 1985 and effectuate additional sampling and analysis. (OSC Affidavit, ¶ 18). At some time (the exact date is unclear), the OSC had also unilaterally "modified" the December 12, 1984 Section 106 Order to cover clean-up of 2 acres rather than 1.1 acres at the site. IPDC's plans did cover this larger area.

The OSC received the revised plan on February 12, 1985 but that same day deemed it inadequate for the following reasons:

> Specifically, they [RTS and IPDC] failed to move up all activities by four days; they extended an agreed on two day tanker cleaning activity to three days; they extended the schedule by four days concluding on March 4th; they did not include the agreed to additional PCB testing; and, they deleted the bulk solids testing from the analysis schedule.

OSC Affidavit, ¶ 20. Because of this alleged non-compliance with his requirements for the clean-up plan, the OSC notified IPDC that pursuant to EPA's removal authority under CERCLA Section 104 and

¶ 25 of EPA's Section 106 Order, EPA's contractor, O.H. Materials, would undertake the clean-up as of February 13, 1985.

Over IPDC's objections, the OSC has conducted the EPA clean-up response at the site since February 13, 1985, and RTS has been prevented from concluding the clean-up for IPDC. This EPA clean-up had no self-imposed termination point; the OSC considered himself able to monitor the site and modify his plan at will. For instance, he reported that on February 14, 1985, his response team discovered a previously unreported waste disposal area at the site that might warrant EPA attention. The OSC had also expressed "uncertainty" regarding the amount of time that would elapse between packaging of the waste materials and their removal to an available disposal site.

IPDC filed a complaint seeking injunctive relief on February 19, 1985 to allow it to continue its private clean-up efforts and to prohibit deprivation of its property without due process. The complaint contained two additional counts: a request for judicial review of the constitutionality of the Section 106 Order and a declaratory judgment that IPDC would not be liable for fines for alleged noncompliance with the Section 106 Order or costs of the EPA clean-up.

█ The initial question in this case is whether the court has jurisdiction to consider plaintiff's request for relief on the merits. Of course, there is no question that a federal district court has original jurisdiction under 28 U.S.C. § 1331 to consider the important questions arising under the Constitution and statutes of the United States presented by IPDC's claim for relief. The court has jurisdiction to determine if it has jurisdiction so long as the issues raised are not frivolous. *United States v. United Mine Workers of America,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). The constitutional question appears to be one of first impression at least in this Circuit and counsel for the Government concedes that the issues of statutory interpretation, while considered to some degree by other district courts, have not been resolved by the Court

of Appeals for the Third Circuit or any other. The issues the court has jurisdiction to determine are whether there may or must be judicial authorization or review by a district court of an EPA Section 106 Order, and if so the appropriate standard for such authorization or review.

Congress enacted CERCLA in 1980 in response to growing concern over the threat to human and environmental health and welfare posed by sites on which hazardous wastes or other hazardous substances were stored or abandoned. Because of the extreme danger of hazardous waste, CERCLA appears to authorize Presidential (or EPA) response without prior administrative notice and hearing for the parties ultimately liable (owner of the site or producer of the hazardous waste), without prior judicial authorization, and without explicit provision for prompt administrative or judicial review after EPA action.

Some courts have found that the statutory scheme demonstrates that Congress did not intend to allow any judicial review of EPA orders until the Government commences either an enforcement action under 42 U.S.C. § 9606 or a recovery action under 42 U.S.C. § 9607(c)(3). *See Lone Pine Steering Committee v. EPA*, 600 F.Supp. 1487 (D.N.J.1985) (no pre-recovery action judicial review only if plaintiff specifically alleges that "EPA had *absolutely no rational basis* for undertaking a response action and that no preliminary assessment had been made") (emphasis added).

This court has grave doubts about the constitutionality of delegating to a variety of administrative officials statutory authorization for deprivation of property without prior notice and hearing or prompt subsequent administrative or judicial review. But for purposes of this preliminary injunction hearing, this court need not determine the general availability of judicial review under CERCLA, as the Government conceded that this court has jurisdiction to determine whether EPA's Section 106 Order and subsequent decision to enter the site complied with CERCLA's statutory scheme.

■ It is well established that the party moving for a preliminary injunction has the burden of showing: (1) a reasonable probability of eventual success on the merits, and (2) that irreparable injury *pendente lite* will occur if relief is not granted. The court should also weigh, wherever relevant, (3) the possibility of harm to other interested persons from the grant or denial of injunctive relief, and (4) the public interest. *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137 (3d Cir.1982); *Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811 (3d Cir.1978). In balancing these competing concerns, the court must consider the extraordinary nature of injunctive relief:

> [a]n injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.' ... the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (citations omitted).

■ We find that IPDC has a substantial probability of prevailing on the merits. First, the Regional EPA Administrator may have lacked the authority to enter the December 12, 1984 Section 106 Order. Second, CERCLA's failure to provide either a pre-deprivation or prompt post-deprivation hearing may represent an unconstitutional deprivation of IDPC's due process rights. Third, EPA may have acted arbitrarily and capriciously in instituting the EPA removal action and effectively ousting IPDC's contractor RTS from the site.

CERCLA § 106(a) provides that, "[t]he President may ... take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment." Executive Order No. 12316 delegated this authority to the EPA Administrator. Section 8(f) of Executive Order No. 12316 also provided that several functions originally delegated to the heads of

various agencies may be redelegated "to the *head of any agency* with his consent." (Emphasis added) According to the December 12, 1984 Section 106 Order, authority under CERCLA was redelegated to the Regional Administrator, but this court has reservations about the legitimacy of this further delegation.

More troubling is the Order's provision that the EPA OSC could (as this OSC did) unilaterally, even after he approved the removal plan, determine that the private removal action was not being "properly" effectuated, 42 U.S.C. § 9604(a)(1), and decide that EPA would enter the site and clean up in lieu of the responsible party already obligated by contract to do so. (December 12, 1984, Section 106 Order, ¶ 25). We know of no authority permitting such summary administrative action by a relatively low-level official [6] without a court order, hearing, or any record.

The cases cited by the Government as justification for the EPA's authority repeatedly emphasize that summary administrative deprivation of property interest violates the Constitution's due process guarantees *except in very narrowly circumscribed emergency situations.* For example, in *Hodel v. Virginia Surface Mining and Reclamation Assn.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), a pre-enforcement challenge, the Supreme Court upheld the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. 1201 *et seq,* permitting the Secretary of the Interior "to order total or partial cessation of a surface mining operation whenever he determines ... that the operation 'creates an immediate danger ...' " 452 U.S. at 298 (citations omitted). But the Secretary's authority was not redelegated. Furthermore, a prompt post-deprivation hearing was an integral part of the emergency power. A mine operator aggrieved by a cessation order could request temporary relief immediately and the Secretary had to respond to such a request within five (5) days of its

receipt. In justifying the absence of the pre-deprivation hearing normally required, *see Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Eash & Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, (3d Cir.1985) (*en banc*); *Friendly,* Some Kind of Hearing, 123 U.Pa.L.Rev. 1287, (1975), the Supreme Court emphasized not only the emergency nature of mining disasters but the "prompt and adequate post-deprivation administrative hearings and an opportunity for judicial review," 452 U.S. at 303, 101 S.Ct. at 2374.

Similarly, *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 599, 70 S.Ct. 870, 872, 94 L.Ed. 1088 (1950), upheld a provision of the Federal Food, Drug, and Cosmetic Act permitting seizure of misbranded articles because the statute provided for a prompt post-deprivation judicial hearing. *See also Bethelehem Steel Corp. v. EPA,* 669 F.2d 903 (3d Cir.1982) (upholding the requirement that parties challenging a notice of noncompliance under the Clean Air Act must exhaust administrative remedies (a hearing on the record with a decision in ninety (90) days) before obtaining judicial review).

In contrast, EPA has interpreted CERCLA to permit delegation of extraordinary powers without any prior judicial authorization or subsequent judicial review. At least one district court has found that due process requires limited judicial review of an EPA clean-up order (under the arbitrary and capricious standard) so that the responsible party is not coerced by the threat of severe sanctions otherwise posed by noncompliance. *See Aminoil, Inc. v. EPA,* 599 F.Supp. 69, 74–76 (C.D.Cal.1984) (not considering the situation where EPA instituted its own clean-up response).

■ The Government did not concede the availability of judicial review under CERCLA, but there is no dispute that, if judicial review is available, the scope of review is the arbitrary and capricious standard pro-

---

**6.** 40 CFR 300.6 (1984) defines OSC as an official designated to coordinate and direct federal responses under the National Contingency Plan but states nothing about the authority of an OSC.

vided by the Administrative Procedure Act, 5 U.S.C. § 706. The testimony at the hearing together with the OSC's Affidavit suggest a strong likelihood that EPA has compounded the constitutional defects seemingly inherent in CERCLA §§ 104 and 106 by acting not only beyond the scope of its statutory authority under the Section 106 Order but in an arbitrary and capricious manner.

The Section 106 Order provided for EPA access to perform a removal action only if IPDC "fails or refuses to comply with the requirements ... above...." (Section 106 Order ¶ 25). But EPA never provided a written explanation or notice that IPDC was not complying with the Order. Instead the OCS insisted on such modifications as he wished from time to time as the clean-up progressed (or failed to progress in his opinion), even if contrary to the original Order. For example, as previously noted, the Section 106 Order covered an area of 1.1 acres which the OCS subsequently, without authorization, changed to 2 acres. The Order also did not contain a definite termination date, although the OCS justified ousting RTS because its predicted completion date was not sufficiently timely.

Additionally, it appears to the court that many of the OSC's decisions regarding IPDC's "non-compliance" may have been arbitrary and capricious. This is particularly true of the OSC's preoccupation that IPDC's plan did not proceed with adequate speed. Certainly, it is in the public interest to remove hazardous waste materials to a proper disposal site as promptly as possible. But a full sixteen months elapsed between the EPA's initial inspection of the site and issuance of the Section 106 Order, while IPDC's delays are alleged to be no more than several weeks. And, of course, the delays were at least partially explained by EPA's increasing the size of the clean-up site substantially and making RTS revise its plan continually. Furthermore, the Phase I activities performed for IPDC by RTS stabilized the site and abated any formerly-existing emergency conditions, so delay did not pose a clear and present danger to the environment thereafter. Moreover,

the OSC terminated RTS's clean-up for IPDC although RTS had disposal sites available to store the removed waste materials, and neither O.H. Materials nor EPA had available storage sites or knowledge of when such sites would be available. The court found it extraordinary that the OSC testified that IPDC's delays warranted EPA intervention but EPA did not know how long it would take for it to remove the packaged and secured waste from the site to a disposal area, so obviously EPA's actions might take longer than RTS's for IPDC.

The OSC also testified that he had several conversations with O.H. Materials concerning that contractor's clean-up of the site between December 11, 1984 and February 12, 1985. But at least until some time in January, 1984 (if ever at all), there was no reason for the OSC to believe that IPDC would not accomplish the removal action promptly. These early contacts with O.H. Materials appear unwarranted and contrary to Congressional intent that EPA "may *not* act where the party responsible for the release or threatened release ... will take proper action." H.R.Rep. No. 1016, Part I, 96th Cong., 2d Sess., reprinted in 1980 U.S.Code Cong. & Ad.News 6119, 6131 (emphasis added), cited in *Lone Pine Steering Committee*, at 1490. We would also expect that concerns over Superfund expenditures as well as this administration's policy of reducing Governmental intervention would cause an EPA clean-up to be an instrument of last rather than early resort.

Of course, since only the plaintiff presented evidence in support of its case for preliminary relief, we have not heard much of the evidence favoring the Government's action. The OSC was called by the plaintiff for cross-examination but the Government did not have the opportunity to present evidence on the nature of the hazard and the need for EPA action. Further development of the Government's case may explain the action of the EPA, but on the present record, it suggests an arrogance of power that is bureaucracy at its

worst; the Government's assertion that its conduct is completely insulated from court review initiated by those harmed thereby compounds the problem.

■ In spite of IPDC's strong demonstration of its likelihood of success on the merits, we must nevertheless deny plaintiff's motion because there was no showing that *irreparable* injury would occur in the absence of injunctive relief. Plaintiff's burden of demonstrating harm is exacting:

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.

*Oburn v. Shapp*, 521 F.2d 142, 151 (3d Cir.1975) (emphasis original).

IPDC's site is currently vacant and there are no pending plans for its lease or development. While EPA is effectively denying IPDC temporary use and control of its property, any unwarranted or unconstitutional trespass can be adequately compensated by a monetary award in the circumstances of this case. Moreover, as IPDC concedes, some contractor must be on the site to perform the removal action. IPDC would prefer the services of RTS, its own contractor, but O.H. Materials' performance of this function does not constitute irreparable harm. Relations between the OSC and RTS employees may also have deteriorated to the point where it is advantageous for a contractor other than RTS to complete the clean-up.

The possibility that EPA will seek costs and penalties from IPDC in a future recovery action also does not pose a threat of irreparable harm. Currently, EPA not IDPC is completing the clean-up, so the threat of sanctions is not coercing IPDC to comply with a Section 106 Order it believes to be unconstitutional. *See Aminoil Inc. v. EPA*, 599 F.Supp. 69, 76 (C.D.Cal.1984) (finding irreparable harm because the threat of severe sanctions would coerce plaintiffs into complying with a Section 106 Order requiring a private party clean-up). EPA will not be permitted to impose sanc-

tions or impose costs on IPDC later found unjustified.

This court will not allow the EPA to store the containerized waste materials indefinitely at the site nor to extend its clean-up beyond the two-acre tract covered by its original order. EPA must make prompt arrangements for disposal of the waste, for it would be unconscionable for EPA to take substantially (and indefinitely) more time to clean up the waste than IPDC would have taken. The Section 106 Order specified only 1.1 acres as the area of concern, though the court will permit a 2-acre clean-up because IPDC and RTS were also prepared to accomplish waste removal from that size area. But EPA has no unilateral authority to extend its clean-up to the remainder of the 5.5-acre site. As agreed to by counsel for the parties, EPA will analyze samples from the remainder of the site promptly and EPA and IPDC will then try to arrange a mutually agreeable procedure with the assistance of the court if further clean-up is required.

Whether the clean-up is completed by EPA instead of IPDC presents little possibility of harm to interested parties not involved in this litigation. The known hazardous substances have already been containerized, the rest of the site is being analyzed, and since the site is vacant, there is no threat of future accumulation of hazardous substances on IPDC's property.

■ There is a strong public interest in protecting public health and our environment. CERCLA serves these important objectives by providing a mechanism by which EPA identifies the existence of hazardous substances and effects prompt removal or remedial action. But there is also a substantial public interest in having such clean-ups accomplished in the most cost-effective manner. Spending precious Superfund dollars on a site when there is a responsible party ready and willing to spend private dollars to accomplish the same result is hardly an efficient use of Government resources.

Moreover, there is a compelling public interest in oversight of governmental actions which deprive individuals of generally protected liberty or property interests. If the legislature does not provide for firm constraints on official action, then the courts must do so. The public interest would be best served if EPA, rather than IPDC, had sought judicial relief. As provided in CERCLA § 106, 42 U.S.C. § 9606(a), when the President (or his legitimate delegate) determines that hazardous substances pose a threat, "he may require the Attorney General of the United States to secure such relief as may be necessary ... [and the federal courts] shall have jurisdiction to grant such relief as the public interest and the equities of the case may require." EPA could have come to court for an injunction ordering private clean-up of the site rather than choosing the alternative of issuing a Section 106 Order. In addition to providing due process, a court order decreases the likelihood of non-compliance by the responsible party because non-compliance would be a contempt of court. There has been no evidence that a Section 106 Order requiring a responsible party to prepare a proposed plan of action for a non-abandoned site accomplishes abatement of danger from hazardous waste more expeditiously than a court order.

If EPA, having issued its own Section 106 Order, determined that the responsible party was not complying, the public interest would again have been served if EPA sought a court order granting it access to the site instead of relying on the broad, ill-defined authority of CERCLA § 104, 42 U.S.C. § 9604, and an alleged unreviewable determination of necessity, to enter the site, remove a private contractor and substitute a contractor preferred by the Government. Unilateral administrative action under Section 104 should be saved for cases of extreme emergency particularly where the site has been abandoned; when there is a known responsible party, that affected party should be able to obtain a prompt hearing.[7]

Because plaintiff made no showing of irreparable injury, the motion for a preliminary injunction is denied but the case will be expedited on the merits. It will be so ordered.

## ORDER

AND NOW, this 21st day of March, 1985, upon consideration of plaintiff's motion for a preliminary injunction, for the reasons stated in the court's bench opinion of February 22, 1985, as elaborated by the foregoing Memorandum, it is ORDERED that:

1. Plaintiff's motion is DENIED.

2. Plaintiff may renew its application for injunctive relief if the EPA clean-up of the two-acre tract is not completed on or before March 22, 1985.

3. Any necessary discovery shall be completed on or before May 1, 1985.

4. A proposed joint final pretrial order, in accordance with Local Rule 21(d), shall be submitted on or before May 15, 1985.

5. A final pretrial conference will be held on May 30, 1985 at 4:30 p.m.

6. EPA and IPDC shall continue their efforts to arrange a mutually agreeable plan of action concerning the remainder of the site without waiver of the legal position of either party.

---

**7.** This would comport with *Hodel,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1982). The Supreme Court there noted that the Secretary of the Interior's power to issue immediate cessation orders under the Surface Mining Control and Reclamation Act of 1977 was primarily intended to avert the possible occurrence of sudden disasters. *Id.* at 300 n. 44, 101 S.Ct. at 2372 n. 44.