UNITED STATES of America, Plaintiff,

v.

Charles PRICE, Individually and D/B/A Price's Trucking Company; Virginia Price; Carl F. Price; Bernard Abramoff, Lee Garrell, Frank Abramoff, Individually and D/B/A A.G.A. Partnership; Astro-Pak Corp.; Chemical Control Corp.; William Carracino; Michael Colleton; Robert Day; Scientific Chemical Processing, Inc.; Leif R. Sigmond; Dominick Presto; Petroleum Tank Cleaning and Disposal, Inc.; Wayne D. Hamby; Carol M. Hamby; Marvin Jonas, Inc.; Samuel H. Jones, Individually and D/B/A S–J Transportation Co.; Evor Phillips Leasing Co.; Evor R. Phillips; King of Prussia Technical Co.; Ernest R. Roth; Harrison L. Kalbach; Robert A. Hauslohner; Harry T. Devine; George Strawbridge; Chemquid Disposal Inc.; Harvey Brooks; Henry Engels; Daniel F. Jackson; Union Carbide Corp.; Honeywell, Inc.; Princeton Chemical Research, Inc.; Essex Chemical Corp.; Hoffman-LaRoche, Inc.; Krylon Corp.; Amoco Chemicals Corp.; Rollins Environmental Services, Inc.; Triangle PWC, Inc.; and the Proctor and Gamble Co., Defendants,

Atlantic City Municipal Utilities Authority, Intervenor.

Civ. No. 80–4104.

United States District Court,
D. New Jersey.

July 28, 1983.

W. Hunt Dumont, U.S. Atty. by Ralph A. Jacobs, Samuel P. Moulthrop, Asst. U.S. Attys., Newark, N.J., for plaintiff.

Arthur Montano, Montano, Summers, Mullen & Manuel, P.C., Cherry Hill, N.J., for defendants Samuel H. Jones, Individually and d/b/a S–J Transportation Co.

Franklin J. Riesenburger, Greenblatt, Greenblatt & Riesenburger, P.A., Vineland, N.J., for defendants King of Prussia Technical Co., Inc., Ernest R. Roth, Harrison L. Kalbach, Robert A. Hauslohner, Harry T. Devine, George Strawbridge.

Richard A. Levao, Shanley & Fisher, P.C., Morristown, N.J., for defendant Krylon Corp.

Samuel V. Convery, Jr., P.A., Metuchen, N.J., for defendant Astro-Pak Corp.

David A. Parker, Parker, McCay & Criscuolo, P.C., Mount Holly, N.J., for defendants Charles Price, Individually and d/b/a Price' Trucking Co. & Virginia Price.

John P. Hauch, Jr., Archer & Greiner, P.C., Haddonfield, N.J., for defendants Bernard Abramoff, Lee Garrell and Frank Abramoff, Individually and d/b/a A.G.A. Partnership.

Paschon, Feurey & Kotzas, Toms River, N.J., for defendant Carl F. Price.

John L. White, White & Uzdavinis, P.C., Woodbury, N.J., for defendant Honeywell, Inc.

Kenneth H. Mack, Greenstone & Sokol, Hackensack, N.J., for defendant Essex Chemical Corp.

John D. Horan, Goodman, Stoldt, Breslin & Horan, P.C., Hackensack, N.J., for defendant Amoco Chemicals Corp.

William T. Cahill, Jr., Cahill, Wilinski & Cahill, P.C., Haddonfield, N.J., for defendant Princeton Chemical Research Inc.

Kevin F. Wall, Cherry Hill, N.J., for defendant Marvin Jonas, Inc.

Evor R. Phillips, pro se.

Rocco M. Nigro, Cherry Hill, N.J., for defendant Ernest R. Roth.

William B. Scatchard, Jr., Capehart & Scatchard, P.C., Moorestown, N.J., and Patricia A. Barald, Covington & Burling, Washington, D.C., for defendant Proctor & Gamble Manufacturing Co.

Ralph N. Del Deo, Crummy, Del Deo, Dolan & Purcell, P.C., Newark, N.J., for defendant Hoffman-LaRoche, Inc.

William H. Hyatt, Jr., Gail H. Allyn, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., for defendant Union Carbide Corp.

Bruce H. Dexter, Fasolo, Krause & Dexter, Hackensack, N.J., for defendant Henry Engels.

William Carracino, pro se.

Evans, Hand, Allabough & Amoresano, Paterson, N.J., for defendant Essex Chemical Corp.

Robert Ellenport, Roseland, N.J., Cole, Schotz, Bernstein, Meisel & Forman, P.C., Rochelle Park, N.J., for defendant Daniel F. Jackson.

Alvin E. Granite, Granite & Heim, Woodbury Heights, N.J., for defendant Rollins Environmental Services, Inc.

BROTMAN, District Judge.

This is a complex environmental action instituted by the United States of America pursuant to § 1431 of the Safe Drinking Water Act (SDWA), 42 U.S.C. § 300i; § 7003 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6973, and Comprehensive Environmental Re-

sponse Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.* (Supp. IV, 1980). The case comes before this court on a motion by generator-defendant Hoffman-LaRoche Corporation for summary judgment.

The United States of America (government) first instituted this suit against defendants Charles Price, individually and d/b/a Price's Trucking Co., Virginia Price and Carl Price, and Bernard Abramoff, Lee Garrell and Frank Abramoff, individually and d/b/a A.G.A. Partnership. The government initially sought injunctive relief to remedy the hazards posed by the waste dumped at Price's Landfill in Pleasantville, New Jersey, during 1971 and 1972. This court denied the motion for injunctive relief and also denied defendants' motion for summary judgment, except with respect to plaintiff's claims brought under the federal common law of nuisance which were summarily dismissed. *United States v. Price*, 523 F.Supp. 1055 (D.N.J.1981), *aff'd*, 688 F.2d 204 (3rd Cir.1982); *see Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981).

On September 21, 1981, two days prior to this court's decision on the preliminary injunction issue, plaintiff filed a second amended complaint adding thirty-five defendants.[1] The new defendants included individuals and corporations who allegedly generated and/or dumped the hazardous waste at Price's Landfill. The amended complaint also added two additional claims brought under CERCLA. Due to the timing of the amendment, this court did not have an opportunity to consider the effect of CERCLA as a statutory basis for this case. (Similarly, the Court of Appeals has not yet addressed that issue, although we take judicial notice of the fact that *United States v. Wade*, 546 F.Supp. 785 (E.D.Pa. 1982), is currently on appeal before the Third Circuit, *see* discussion, *infra.*)

On September 14, 1982, the Court of Appeals for the Third Circuit affirmed this court's decision in *Price*, 688 F.2d 204. Shortly thereafter, we ordered the government to prepare a summary, outlining the evidence that it had compiled against each defendant. The summary was prepared and submitted to the court on November 17, 1982. In its introduction the government explains the purpose behind the summary:

"The evidence contained in this summary has been gathered through both discovery during the initial phase of the case and independent investigation and testing. At this point, however, there has been virtually no discovery from most of the defendants. Accordingly this summary does not purport to be a complete and exhaustive rendition of all the evidence which the government will employ at trial. To the extent feasible, it represents a compilation of the information which is presently within the government's knowledge.

By this summary, the government waives no right to conduct full and complete discovery under the Federal Rules of Civil Procedure, the Constitution, federal statute or regulation, or other legal authority. Further, the government waives no right to augment or correct the information contained in this summary during the regular course of discovery as such information becomes available.

Summary of Evidence, November 17, 1982, at p. 1.

Following the completion of the summary, the court held a conference on the

---

1. Astro-Pak Corp.; Chemical Control Corp.; William Carracino; Michael Colleton; Robert Day; Scientific Chemical Processing, Inc.; Leif R. Sigmond; Dominick Presto; Petroleum Tank Cleaning and Disposal, Inc.; Wayne D. Hamby; Carol M. Hamby; Marvin Jonas, Inc.; Samuel H. Jones, individually and d/b/a S–J Transportation Co.; Evor Phillips Leasing Co.; Evor R. Phillips; King of Prussia Technical Co.; Ernest R. Roth; Harrison L. Kalbach; Robert A. Haus-lohner; Harry T. Devine; George Strawbridge; Chemquid Disposal Inc.; Harvey Brooks; Henry Engels; Daniel F. Jackson; Union Carbide Corp.; Honeywell, Inc.; Princeton Chemical Research, Inc.; Essex Chemical Corp.; Hoffman-LaRoche, Inc.; Krylon Corp.; Amaco Chemicals Corp.; Rollins Environmental Services, Inc.; Triangle PWC, Inc.; and The Proctor and Gamble Co.

record among all parties. A number of generator defendants requested, at that time, that they be given the opportunity to move for summary judgment prior to becoming deeply involved in the discovery process. Such requests were premised on the summary itself and the belief, held by certain generator defendants, that they should not be forced to defend this case since the government had little or no evidence against them. In an effort to expedite the action, the court suggested that just one generator defendant, Hoffman-La-Roche (Roche), move for summary judgment.[2] If this action proved successful, others could take appropriate action.

It was originally intended that Roche would address only the discovery issue—in other words, its motion for summary judgment would be premised on its belief that the government had not compiled sufficient evidence to hold it in the case. After the briefs were submitted, however, it became obvious that Roche had gone far beyond that limited issue, since statutory grounds for summary judgment were articulated as well. At that point other defendants, specifically Union Carbide Corp., requested leave from this court to file a brief in support of Roche's motion for summary judgment. Its intended purpose was to supplement Roche's statutory arguments. Additional time was allotted for responses from all interested parties who so wished to file.

As it now stands, Roche's motion is premised on three separate grounds. It claims that the complaint should be dismissed pursuant to Rule 11, since the government had no "reasonable basis" for its allegations. Roche also moves for summary judgment, arguing that past, nonnegligent, offsite, generators cannot be held liable under any of the statutes asserted in this action (such as SDWA; RCRA; or CERCLA). Finally, defendant maintains that the government has failed to demonstrate any issue of material fact because of

its inability to prove any nexus between Roche and the waste deposited at Price's Landfill and therefore it is entitled to judgment. Fed.R.Civ.P. 56(c).

*Factual Background*

The facts pertinent hereto are thoroughly outlined in this court's previous decision in this case. *See United States v. Price*, 523 F.Supp. 1055, 1057–66. The only new relevant facts relate to the development of the government's case against Roche. In its summary, the government notes that Roche had a place of business in Nutley, New Jersey. Laboratory chemicals were generated at the Nutley plant and subsequently packed into drums. Roche paid a transporter, Scientific Chemical Processing Company (SCP) to pick up the drums and dispose of them. The president of SCP, Carl Ling, testified at a deposition that he went to the Nutley plant numerous times, packed the drums and deposited them at various landfills. The empty drums were supplied by Roche and the chemicals included acids, bases, and organic liquids. Ling also remembered that he took some lab packs to Price's Landfill, however, he could not link directly the Roche lab packs with those waste materials dumped at the landfill.

The government also produced three loading tickets, discovered in Price's business records, which indicate that waste chemicals originating at Roche's plant ended up at Price's Landfill. The one ticket mentioned in the summary is dated June 9, 1972. Since the summary was compiled, the government has produced two more loading tickets from approximately the same time period. Furthermore, the government maintains that they possess other facts which suggest that more than three loads of Roche's waste were deposited at the landfill during the period in question.

*Rule 11*

■ Initially, Roche contends that the government did not have reasonable

---

**2.** Hoffman-LaRoche was one of several defendants who were joined in spite of the fact that the government had only been able to produce a

minimal amount of proof against them. The other parties, similarly situated, agreed to let Hoffman-LaRoche file the first motion.

grounds on which to bring it into this lawsuit, and therefore, according to Rule 11, Fed.R.Civ.P., the complaint should be dismissed as to Roche.

Rule 11 reads in pertinent part, as follows:

"The signature of an attorney [on the pleading] constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information and belief there is good ground to support it and that it is not interposed for delay. If a pleading is not signed or signed with intent to defeat the purpose of this rule, it may be stricken as a sham and false and the action may proceed as though the pleading had not been served."

Rule 11 requires an attorney to take some steps or to conduct limited investigation to satisfy himself that grounds exist to support his pleadings. 2A Moore's Federal Practice ¶ 11.02 at 11–7; *Freeman v. Kirby*, 27 F.R.D. 395 (E.D.N.Y.1961). In other words, the rule is intended to provide a minimal, ethical standard to which attorneys are bound when they file pleadings with the court. *Levy v. Seaton*, 358 F.Supp. 1 (S.D.N.Y.1973). It was not promulgated, however, as a means of compelling lawyers to compile all of their evidence prior to signing and filing a complaint. Wright and Miller, 5 Federal Practice and Procedure § 1333 at 499–500.

■ In this instance, as defendant points out, the court did question the basis for plaintiff's second amended complaint. *See* Transcript, dated December 4, 1981, at 14–3 to 14–13. The concern was especially acute because the government admitted that it could not file its initial complaint against the generator defendants in good faith. In order to satisfy both the court and the defendants that the government did possess "a sufficient evidentiary basis" for its second amended complaint, the United States Attorney was instructed to produce a summary of all the available evidence. A factual basis for the action was outlined in the summary. Moreover, the government added two new counts in its second amended complaint, arising under

CERCLA, a recently enacted statute. (*See* complaint dated September 21, 1981, counts arising under 42 U.S.C. §§ 9606(a), 9607; *see* discussion, *supra*). It is quite possible that the government needed time to assess the situation and decide whether an action against the named generator defendants was plausible under CERCLA. When the government decided the time was right and it had sufficient evidence, the second amended complaint was filed.

In view of the evidence presented in the summary, the recent rash of legislation in the environmental area and the circumstances surrounding the case, it is clear that the government attorneys did not act in bad faith or unreasonably when they signed the amended complaint. Therefore, defendant's motion to dismiss the complaint pursuant to Rule 11 is hereby denied.

## CERCLA

### Background

The government's second amended complaint also introduces complex issues heretofore unanswered, with respect to the statutory provisions of CERCLA. Defendant raises two key legal questions concerning its potential liability under 42 U.S.C. §§ 9606(a) and 9607. First, Roche maintains that it does not come within the intended scope of CERCLA and therefore should be granted summary judgment as to counts alleging liability under § 9606(a) [§ 106] and § 9607 [§ 107]. According to defendant, § 106(a) only applies prospectively, and therefore may be invoked only when the government seeks to enjoin illegal dumping of hazardous waste. *See United States v. Wade*, 546 F.Supp. 785 (E.D.Pa.1982). Roche also argues that § 107 was only meant to be utilized by the government to sue for those costs already incurred. *See, e.g., State ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300 (D.Ohio 1983). Second, defendant contends that § 106(a), if applicable, is a substantive statute and therefore the standard of liability articulated in § 107 should not apply. Moreover, even if liability as defined in § 107 is applicable to § 106(a), said standard is one of negligence, not strict liability.

Since CERCLA is a relatively new statute, a brief discussion of the legislative history and the reasons behind the passage of the act is necessary. On December 11, 1980, after protracted and heated debate, Congress enacted the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA); Pub.L. No. 96–510, 94 Stat. 2767 (1980), Codified at 42 U.S.C. §§ 9601–57 (Supp. IV, 1980). Although Congress had attempted to address the broad spectrum of environmental problems through previous legislation, it had failed to provide relief for the consequences of prior reckless and improper hazardous waste disposal practices. The most recent and comprehensive attempt prior to CERCLA was the Resource Conservation and Recovery Act (RCRA). This act was characterized at the time of enactment as a "prospective cradle-to-grave regulatory regime governing the movement of hazardous waste in our society." *See* Goldfarb, *The Hazards of our Hazardous Waste Policy*, 19 Nat. Resources J. 249, 253. CERCLA was promulgated in response to deficiencies in RCRA and to the growing problem caused by the large number of uncontrolled "inactive hazardous waste sites." In fact, Congress, describing the background and necessity for CERCLA, specifically noted that "existing law is clearly inadequate to deal with this massive problem ... [and therefore] the need for a strong legislative response is evident." H.R.Rep. No. 1016, 96th Cong.2d Sess., pt. 1 at 18, reprinted in 1980 U.S.Code Cong. & Ad.News 6119, 6120.

CERCLA was created in a unique attempt by Congress to mitigate some of the problems caused by inactive hazardous waste sites. It was hastily, and, therefore, inadequately drafted. Even the legislative history must be read with caution since last minute changes in the bill were inserted with little or no explanation. See 126 Cong.Rec.S 14,962–15,009 (daily ed. Nov. 24, 1980); 126 Cong.Rec.H 11,786–802 (daily ed. Dec. 3, 1980). Because of the haste with which CERCLA was enacted, Congress was not able to provide a clarifying committee report, thereby making it extremely difficult to pinpoint the intended scope of the legislation. (For a thorough discussion of the last minute problems with the language used in CERCLA, *see* 130 U.Pa.L.Rev. 1229, 1242–45 (1982); *see also United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1111–12 (D.Minn. 1982).

The Committee reports do make clear, however, the general purpose behind CERCLA; the most emphasized reason being the inadequacy of prior legislation in the environmental area. H.R.Rep. No. 1016, *supra* at 18, reprinted in 1980 U.S. Code Cong. & Ad.News 6119, 6120. In passing the bill, Congress specifically mentions "important regulatory gaps" in RCRA which the new legislation seeks to plug. These include the fact that RCRA is "prospective and applies to past sites only to the extent that they are posing an imminent hazard." H.R.Rep. No. 1016, *supra* at 22, reprinted in U.S.Code Cong. & Ad. News 6119, 6125; *cf. United States v. Price*, 523 F.Supp. 1055 (D.N.Y.1981) (In *Price* this court held that RCRA could apply to past hazardous waste sites but only to the extent that the hazardous condition presented a current and ongoing threat to the environment.). Another deficiency of RCRA, noted in the legislative history for CERCLA, is the realistic concern of environmental groups and the government that the liability provisions are of no help if "a financially responsible owner of the site cannot be located." *See* H.R.Rep. 1016, *supra* at 22, reprinted in 1980 U.S.Code Cong. & Ad.News at 6125. In response, CERCLA authorizes the government to bring actions against other potentially responsible parties such as generators and transporters. The House Committee ultimately recommended CERCLA, noting that "it is the intent of the Committee in this legislation to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." H.R.

Rep. No. 1016, *supra* at 22, reprinted in U.S.Code Cong. & Ad.News at 6125.[3]

*Section 107*

■ The initial question that must be addressed in this motion, is whether CERCLA, by its own terms, precludes the government from seeking monetary or equitable relief from potentially responsible parties prior to expending any of the superfund allocated for that purpose. The language used in § 107 indicates that a party found liable, "shall be liable for:

(A) all costs of removal or remedial action incurred by the United States government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release."

It appears with respect to § 107, that the government must first begin the cost of the clean-up and incur some expenses before it can initiate an action. 42 U.S.C. § 107(a)(1); *see Brown v. Georgeoff*, 562 F.Supp. 1300 (N.D.Ohio 1983). The statutory language is quite explicit and speaks solely in terms of costs incurred. Moreover, the court in *Brown* implied that § 107 was intended to cover only those instances where the government had already begun the clean-up process and was seeking reimbursement.[1]

In the instant action, the EPA has not yet undertaken any clean-up effort and as such has not incurred any costs pursuant thereto. Other costs may have been incurred during the investigatory stage, or in producing the feasibility study. However, the government has failed to specify such grounds as a basis for this lawsuit.[5] Because of its failure to establish an action under § 107, any claims brought solely under that section are hereby dismissed without prejudice.

*Section 106*

The government also asserts claims under § 106(a) which read as follows (heading used for § 106 is "abatement actions"):

"In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may

---

3. The act also sets up a provision and statutory scheme for the collection and disbursement of monies as a quick response to inactive hazardous waste sites. This is commonly referred to as the "superfund." 42 U.S.C. § 9604. The general purpose of the superfund is to allow the government (along with local and state authorities) to accelerate the elimination of unsafe hazardous waste sites by responding to such dangers in a rapid, systematic and cost-effective manner. H.R.Rep. 1016, *supra* at 25, reprinted in U.S.Code Cong. & Ad.News at 6128. In the instant situation (Price's Landfill), the Environmental Protection Agency [EPA] has not yet utilized the superfund, even though Price's Landfill is ranked quite high on their priority list.

4. In *Brown*, the plaintiff (State of Ohio), had only incurred costs equaling less than 10% of the total projected clean up cost, however the court concluded that the money expended was sufficient to trigger an action under § 107.

5. Count 4 of the Second Amended Complaint does allege that "the United States has incurred and will continue to incur response costs." It does not, however, specify any such costs. Nor does the government discuss what costs were incurred or where the money was spent. Moreover, the feasibility study was not completed until more than a year after the Second Amended Complaint was filed. This indicates that most, if not all, of the expense of that study was incurred subsequent to the filing of the action under CERCLA. As such, there are no "costs incurred" as defined by § 107.

also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment."

The defendants maintain that § 106(a) was not drafted with this type of action in mind. They argue that the relief sought is impractical and would ultimately prove exceedingly burdensome to both the court and the parties. *See, e.g., Friends of the Earth v. Wilson,* 389 F.Supp. 1394, 1396 (S.D.N.Y.1974). Moreover, defendants point to a recent decision in a case involving similar facts, in which the court held that § 106(a) was not applicable to nonnegligent, off-site generators that were no longer actively dumping waste in the landfill. *United States v. Wade,* 546 F.Supp. 785 (E.D.Pa.1982). Finally, also in accordance with the holding in *Wade,* defendants contend that the government's attempt to institute an action under § 106(a) is a blatant attempt to circumvent the statutory scheme because it contravenes the Congressional intent behind the superfund. *United States v. Wade, supra,* 546 F.Supp. at 794.

*Wade* is the only case decided to date in which the government attempted to hold nonnegligent, off-site generators liable under § 106(a). *But see United States v. Outboard Marine Corp.,* 556 F.Supp. 54 (N.D.Ill.1982); *United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100 (D.Minn.1982). (In both *Outboard Marine* and *Reilly Tar* the defendant was the owner of the landfill. It must be noted, however, that in both cases the court found that § 106(a) applied to *past* actions.)

*United States v. Outboard Marine, supra,* 556 F.Supp. at 58, n. 3.[6] Judge Newcomer, in *Wade,* narrowly interpreted § 106(a) and noted that neither the statute nor the legislative history pursuant thereto, indicated whether Congress intended § 106(a) to be applied in cases where the government had not yet incurred any clean up costs. *United States v. Wade, supra,* 546 F.Supp. at 793. He also compared the language of § 106(a) to that of § 7003 (RCRA), focusing primarily on the fact that both sections were drafted in the present tense. (§ 106(a), in relevant part reads: "an actual or threatened release of a hazardous substance from a facility."). As such, Judge Newcomer concluded that § 106(a) was only intended to be used in emergency situations where hazardous waste is currently being discharged.

■ After carefully analyzing the statutory language and the purposes of CERCLA, this court must respectfully disagree with both the reasoning used and the result arrived at in *Wade.* The comparison between § 106(a) and § 7003 is inevitable. In fact, as the court in *Reilly Tar* recognized, the imminent hazard provisions of § 106(a) are even broader than those articulated in § 7003.[6a] *United States v. Reilly Tar, supra,* 546 F.Supp. at 1111. Moreover, the court in *Wade* construed § 106(a) in the same narrow manner that it construed § 7003. The decision in *Wade,* however, was prior to the Third Circuit decision in this case, *United States v. Price,* 688 F.2d 204 (3rd Cir.1982), in which the court held that § 7003 could be applied to a dormant site if it poses a current threat to the environment or to public health. *See United States v. Price, supra,* 688 F.2d at 214;

**6.** The courts in *Outboard Motor* and *Reilly Tar* both held that the government could sue owners of the dump site under § 106(a) even though the sites were no longer active. The decision in *Outboard Motor* was rendered after *Wade,* and though the court attempted to distinguish the two cases, it was conceded that "the court's reasoning [in *Wade* ] cannot be reconciled with the views expressed here and by the district court in *Reilly Tar." United States v. Outboard Motor, supra* at 58.

**6a.** Section 7003 reads as follows: "[if] waste or hazardous waste may present an imminent and substantial endangerment to health or to the environment, the administrator may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person contributing to such handling, storage, treatment, transportation, or disposal to stop such handling, storage, treatment, transportation, or disposal or to take such other action as may be necessary." 42 U.S.C. § 6973(a).

S.Rep. No. 96–848, 96th Cong., 2nd Sess. at 11 (1980); H.R.Rep. 96–1016 (Part I), 96th Cong. 2nd Sess. at 21 reprinted in (1980) U.S.Code Cong. & Ad.News 6119, 6124. Similarly, the language of § 106(a) suggests that liability may arise when a party is shown to be responsible for an ongoing hazard, even though the site may not be in use. *See also United States v. Outboard Marine Corp.*, 556 F.Supp. 54 (D.Ill.1982).

Defendant also argues that Congress was reluctant to involve the courts in the clean up process and therefore provided a superfund along with the necessary statutory mechanism for implementation. While this may have been one purpose behind the superfund, it does not necessarily preclude the government from also seeking emergency relief from potentially responsible parties under § 106(a). The primary purpose of CERCLA was to "[accelerate the] elimination of unsafe hazardous waste sites." H.R.Rep. No. 1016, *supra* at 25 reprinted in 1980 U.S.Code Cong. & Ad. News at 6128. In view of the overriding need, it is doubtful that Congress would draft § 106 intending it to apply only prospectively.[7] It is far more likely that Congress envisioned possible problems with the government funding numerous clean ups and drafted § 106(a) as a viable alternative or concurrent means of achieving the same goal.[8] If, in fact, Congress did not intend the EPA to pursue remedial action with respect to past sites, other than just by use of the superfund, it would have been forced to allot more money to the fund itself. In other words, if the EPA is forced to use the superfund, and finance the entire clean up operation prior to even initiating an action for those costs against responsible parties, the $1.6 billion allocated to the fund would be depleted almost immediately. *See Eckhardt, The Unfinished Business of Hazardous Waste Control*, 33 Baylor L.Rev. 263 (1981). Moreover, according to the defendant's interpretation, once the superfund is depleted, the government will have no further recourse against potentially liable parties, since there will be no costs incurred. This result makes no sense both practically and in light of the objectives with which Congress promulgated the legislation.[9]

For the above reasons and in view of the broad and ambiguous language used in § 106(a), this court hereby holds that CERCLA was intended and should apply to past, off-site generators if the circumstanc-

7. Especially when RCRA already deals with the problems presented by ongoing illegal dumping—the interpretation urged by defendants would make § 106 a redundant and virtually useless piece of legislation.

8. While CERCLA seems to encourage swift government action, it allots only $1.6 billion dollars to the superfund. Even the lowest estimates regarding clean up costs exceed that figure by almost 5 billion dollars, Eckhardt, *supra*, 33 Baylor L.Rev. 263 (1981), and the EPA estimates that such costs will actually run from 13.1 billion as high as 22.1 billion dollars just to take care of the 1200–2000 most dangerous inactive sites. H.R.Rep. No. 1016, *supra* note 8 at 20, reprinted in 1980 U.S.Code Cong. & Ad. News, 6119, 6120.

9. Furthermore, the legislative history implies that Congress was initially intending to give the President a broad grant of power in which he would be capable of ordering a "responsible party" to take appropriate remedial action. (Responsible party is defined in 42 U.S.C. § 9601(9) to mean "any person who ... (2) generated or disposed of a substantial portion of the hazardous waste treated, stored, or disposed

of at an inactive site.") Council of Environmental Quality, Tenth Annual Report 174 (1979); U.S.Code Cong. & Ad.News at 6131. In fact, the Committee report bars the EPA from acting if it determines that the responsible party will take proper action. *Id.* Although this authorization does not appear in the statute as finally drafted, it appears that Congress structured § 106(a) in such a broad fashion as to allow the EPA to at least have a judicial remedy against potentially responsible parties prior to spending taxpayer money. This is borne out by the fact that § 106 itself was intended to be a mechanism with which the EPA could enforce orders requiring responsible parties to pay their share of clean up costs. H.R.Rep. No. 1016, 96th Cong.2d Sess., pt. 1 at 33, reprinted in U.S.Code Cong. and Ad.News at 6136. In its current form, the section only calls for penalties to be assessed if a responsible party fails to comply with an order rendered under subsection (a), thereby indicating that the remedy under subsection (a) may be structured so as to compel a party to do whatever is required to remedy the dangerous situation. 42 U.S.C. § 9606(a).

es indicate an "imminent and substantial endangerment." Since there is no dispute that Price's Landfill requires immediate action, it is not improper for the government to sue the defendants for relief under § 106(a).

*Liability Under § 106(a)*

■ The second issue raised by defendant concerns the standard of liability applicable pursuant to § 106(a). The defense argues that even if § 106(a) does apply to the instant case, the proper standard of care should be negligence, not strict liability. Such reasoning assumes that either § 107, which defines liability does not apply to § 106(a), or that § 107 does not set forth a standard of strict liability. We disagree with both arguments and for the following reasons conclude that the defendant generators in the instant case should be held strictly liable for their alleged acts.

In analyzing the standard to be applied under § 106, we must first determine whether the section as drafted contains an independent definition of liability. Of the two courts that have heard actions under § 106(a), one applied the § 107 standards of liability, *United States v. Outboard Marine, supra*, and the other held that § 106 was substantive and contained its own standard. *United States v. Reilly Tar, supra*. The court in *Reilly Tar* quoted the phrase "the public interest and the equities of the case" and concluded that such language implied that Congress intended a standard similar to that used in federal common law nuisance actions. *See United States v. Reilly Tar, supra*, 546 F.Supp. 1100, 1113, n. 2.

The *Reilly Tar* interpretation is difficult to fathom given the result of *Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) where the Supreme Court held that federal common law of nuisance had been preempted in the area of water pollution due to the recent outbreak of complex legislation. *Milwaukee v. Illinois, supra*, 451 U.S. at 317–19, 101 S.Ct.

at 1792–93. *See also United States v. Outboard Marine, supra*. A better reading of the statute was articulated by the court in *Outboard Marine* when it stated that "Congress included this imminent hazard authority [§ 106] in its CERCLA design and it should be given effect.... Whatever the source of the substantive law to be applied in a 106(a) action, it is most probable that those who would be liable under Section 107 were intended to be liable in an action under 106(a) for injunctive relief." *United States v. Outboard Marine, supra* at 57.[10]

This court fully concurs with the result reached in *Outboard Marine* and in so holding, we include the following additional reasons for applying the standards set forth in § 107. The heading used for § 107, "Liability" denotes an intention to have this section define liability for the entire act. This conclusion is reinforced by the fact that § 107 does not contain any qualifying language. Instead, it appears that Congress desired to use quite broad and unrestrained terminology. In this manner, § 107 sets forth standards of liability and associated defenses. Section 106(a) on the other hand, is quite vague and does not discuss any independent standards of liability with respect to those parties coming within its coverage. As such, it appears that § 106(a) is dependent upon the substantive provisions explaining liability outlined in § 107.

After deducing that the § 107 definition of liability applies in the instant action, we must next determine the proper standard as articulated in that section. The moving party, Roche, concedes that § 107 calls for a standard of strict liability. (*See* Roche Brief at p. 20.) Another defendant, Union Carbide Corp., however, submitted a brief in support of Roche's motion and questions whether strict liability should apply even under § 107. We note that although the term "strict" was deleted at the last minute, H.R. 7020, 96th Cong.2d Sess. reprint-

---

**10.** We note at this point, the admonishment by the Court of Appeals in this, *United States v. Price*, 688 F.2d 204, 211, that injunctive relief does not necessarily preclude the expenditure of money. *But see Jaffee v. United States*, 592 F.2d 712 (3rd Cir.1979).

ed in H.R.Rep. No. 1016, part 1 at 2–17; it still appears that Congress intended to impose a strict liability standard subject only to the affirmative defenses listed in § 107(b). *See* Note, Generator Liability Under Superfund for Clean-up of Abandoned Hazardous Waste Dumpsites, 130 U.Pa.L.Rev. 1229, 1252–58 (1983). This conclusion is reinforced by virtue of the fact that Congress left the "due care" defense in the statute, a defense which would be rendered meaningless in the absence of strict liability. 42 U.S.C. § 9607(b)(3). Moreover, the strict liability standard fits most closely with the legislative aims of CERCLA which include goals such as cost-spreading and assurance that responsible parties bear their cost of the clean up. H.R.Rep. No. 1016, *supra* at 17, reprinted in U.S.Code Cong. & Ad.News at 6119; *see* 68 U.Va.L.Rev. 1157 (1982). The fulfillment of these Congressional goals is more likely to be effectuated if the defendants who allegedly contributed to the environmental mess are now held to a very stringent standard of liability. Though strict liability may impose harsh results on certain defendants, it is the most equitable solution in view of the alternative—forcing those who bear no responsibility for causing the damage, the taxpayers, to shoulder the full cost of the clean up.[11]

■ Finally, we turn to the "due care" affirmative defense set forth in § 107(b)(3) which reads as follows:

"an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly with the defendant … if the defend-

ant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions;"

42 U.S.C. § 9607(b)(3).[12] Roche contends that the government has not alleged a lack of due care in its complaint and therefore this court must assume that the requirements of § 107(b)(3) have been satisfied. The above-cited section, however, constitutes an affirmative defense. As a result, the burden of proof is on the party raising the defense, in this instance, Roche. In fact, the language of the subsection specifically states that the defendant must establish "by a preponderance of the evidence" that due care was exercised. 42 U.S.C. § 9607(b)(3). Obviously, at this point in the litigation, Roche is not able to prove that it exercised due care, in part because the company has not been presented with the full range of evidence implicating it in the dumping scheme (if such evidence does, in fact, exist). Since Roche has the burden of proving the "due care defense," and has not yet satisfied that burden, its motion for summary judgment must be denied.

In light of the reasons set forth in this opinion this court concludes that Roche can be held liable under § 106(a) of CERCLA, as a potential past, nonnegligent, offsite generator of hazardous waste deposited at Price's Landfill.[12a]

---

11. Congress eliminated any language requiring plaintiff to prove proximate cause. This was done at the last minute and is not reflected in the legislative history. *See* 130 U.Pa.L.Rev., *supra* at 1258; S. 1480, 96th Cong., 2d Sess., 126 Cong.Rec.S 14,940 (daily ed. Nov. 24, 1980). Once again, this court notes the particular difficulty in the instant case due to the ambiguity and confusion inherent in both the statute and accompanying legislative history.

12. The relevant legislative history cited by defendant reads, in part, as follows:

"The mere act of generation or transportation of hazardous waste or the mere existence of a generator's or transporter's waste in a site with respect to which clean up costs are incurred would not, in and of itself, result in liability under § 3071 (predecessor version of section 107)."

H.R.Rep. No. 96–1016, *supra* at 33, reprinted in 1980 U.S.Code Cong. & Ad.News 6119, 6136.

12a. It appears from the language of CERCLA and the accompanying legislative history, that Congress passed the statute in response to recog-

*Factual Grounds for Summary Judgment*

Roche also moves for summary judgment based on the summary of evidence compiled by the government and submitted to the court. The summary was supplied by the government and filed with this court on November 19, 1982, and it outlined all the relevant evidence which the government had against each defendant at that point in time.

Roche contends that the government has taken ample discovery and has still failed to produce any relevant evidence implicating the company. The government, on the other hand, argues that it has conducted only minimal discovery. Moreover, the government notes that Roche, when confronted with discovery requests, has not been forthcoming. Certain problems arose when the government attempted to depose a high level employee of Roche. The government also claims that the company has failed to provide meaningful responses to interrogatories which had been propounded upon them. Roche disputes these allegations. Since the discovery process has been fraught with heretofore, unresolved problems and hence, there has been a limited amount of evidence uncovered, the government requests that this court deny Roche's motion for summary judgment at least until it has had a full opportunity to conduct discovery. Fed.R.Civ.P. 56(f).

The standard for granting summary judgment is a stringent one. Rule 56(c), Fed.R.Civ.P., provides that summary judgment may be granted only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Special Jet Services, Inc. v. Federal Insurance Co.*, 643 F.2d 977 (3rd Cir.1981); *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62 (3rd Cir. 1978). In deciding whether an issue of material fact does exist, the court is obligated to view all doubt in favor of the nonmoving party. *Tomalewski v. State Farm Insurance Co.*, 494 F.2d 882 (3rd Cir.1974); *Smith v. Pittsburgh Gage and Supply Co.*, 464 F.2d 870, 874 (3rd Cir. 1972).

■ The government, as noted above, cites Rule 56(f) in further support of its position:

"Should it appear from the affidavits of a party opposing the motion that he cannot, for reasons stated, present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

Fed.R.Civ.P. 56(f). Most courts are reluctant to grant summary judgment prior to the termination of discovery. Wright & Miller, 10A Federal Practice and Procedure § 2741 at 546 (West 1983); *see, e.g., City of Rome v. United States*, 450 F.Supp. 378 (D.D.C.1978). Moreover, in situations such as the one presented in this action, where a plaintiff must obtain a good deal of information from the opposing party, judgment

nized deficiencies in RCRA and SDWA. One of the most frustrating problems with RCRA, was its perceived failure to take into account past, off-site generators who hired third parties to dump their waste; *see* 126 Cong.Rec.H 9459–60 (daily ed. Sept. 23, 1980) (remarks of Representatives Florio and Dingell); Hazardous and Toxic Waste Disposal: Joint Hearings on S. 1341 and S. 1480 Before the Subcommittees on Environmental Pollution and Resource Protection of the Senate Committee on Environmental and Public Works (Part 4), 96th Cong., 1st Sess. 7 (1979). Even this court's decision interpreting the scope of RCRA and SDWA, limited the potential liability for owners under the provisions of those two

statutes. *United States v. Price*, 523 F.Supp. at 1071 ("We conclude that the statute does not authorize a general clean up of dormant waste disposal sites, but that the Government may rely upon it to prevent further harm to the environment.")

Since we conclude, in this decision, that past off-site nonnegligent generators can be held liable for clean up costs under CERCLA, it is unnecessary to decide whether the same defendants can be held liable under the other statutes. As such, this court offers no comment on the issue at this time, however we recognize that generator liability under RCRA and SDWA may be an important issue at some future date.

should be withheld until the discovery process has been completed. *National Life Insurance Co. v. Solomon*, 529 F.2d 59, 61 (2nd Cir.1975); *Hummel v. Riordon*, 56 F.Supp. 983, 987 (D.Ill.1944).

 The evidence presented at this early date in the litigation is sufficient to defeat defendant's motion. The government has produced a total of three loading tickets indicating that waste chemicals generated by Roche ended up at Price's Landfill.[13] Furthermore, although the deposition testimony of Carl Ling, president of SCP, is far from dispositive, it does demonstrate that SCP (a transporter) disposed of "lab packs" filled with chemicals and that it was hired by Roche during the relevant time period to transport chemical waste. *See* deposition of Carl Ling, dated August 12, 1983, at p. 32; affidavit submitted by Gregory Halbert, dated January 20, 1983. While the evidence compiled by the government is not overwhelming, it does serve to illustrate outstanding issues of material fact with respect to Roche's alleged involvement in the dumping at Price's Landfill.

There is also no dispute as to the fact that discovery is still ongoing. *See* Affidavit of Halpert, *supra* at ¶ 12. The government maintains, however, that Roche has frustrated its attempts, to date, at gathering relevant information. One example cited, with respect to Roche's alleged obstructive tactics, occurred during the government's deposition of John Alexander, a corporate attorney employed by the company. Mr. Alexander was supplied by Roche in response to a deposition request by the government for an employee who had knowledge of the "generation, handling, storage, treatment, transportation, disposal, or arrangement to dispose of ... hazardous wastes by Roche, ... at Price's Landfill." *See* Deposition, John Alexander, dated November 24, 1981. The company contends that it sent Mr. Alexander because it knew of no employee with the requirements set forth in the notice of deposition. Mr. Alexander explained as much at the deposition. The government, however, complains that he came with a prepared written statement, read the statement, and then refused to answer any other questions posed to him. Alexander Deposition, *supra* at 17–18. While this court is not in a position to resolve the discovery disputes at this time, we do note that these issues must be dealt with prior to granting judgment for either defendant or plaintiff. At this point, regardless of who has been at fault in the past, we direct Roche (and at the appropriate time, all the other defendants in this action) to be forthcoming with respect to the government's discovery attempts.

**13.** Roche argues that the loading tickets are inadmissible as evidence. Fed.R.Evid. § 803(6); *see Zenith Radio Corp. v. Matsushita Electronic Industrial Co.*, 505 F.Supp. 1190, 1231 (E.D.Pa. 1980). As such, they should not be given credence by the court in deciding this motion. The government on the other hand, takes the stance that the evidentiary dispute does not have any significance with respect to this motion, but in fact, underscores the need for further discovery.

Rule 56(e) states that an affidavit in support or opposition to a motion for summary judgment, "shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence." Fed.R.Civ.P. 56(e). This requirement, however, has been interpreted in a lenient fashion. *Corley v. Life and Casualty Insurance Co. of Tennessee*, 296 F.2d 449, 450 (D.D.C.1961). The court in *Corley* held that:

"the rule does not require an unequivocal ruling that the evidence suggested in this particular affidavit would be admissible at trial as a condition precedent to holding the affidavit raises a genuine issue. In many cases, it is possible to say without qualification that evidence recited in an affidavit under Rule 56(e) would or would not be admissible; but it is not so here. Admissibility of testimony sometimes depends upon the form in which it is offered, the background which is laid for it, and perhaps on other factors as well."

*Corley v. Life and Casualty Insurance Co. of Tennessee*, *supra* at 450. In the instant case, it is also unclear as to whether the loading tickets would be admissible during trial based solely on the evidence available at this time. On the other hand, it is far from clear that such evidence would not be admissible. Because of this uncertainty and because the government has moved for time to conduct additional discovery pursuant to Rule 56(f), this court must reject Roche's evidentiary argument without prejudice.

As indicated in the above discussion, this court is inclined to deny Roche's motion for summary judgment and in turn, grant the government's Rule 56(f) request, allowing it more time to continue the discovery process. With this decision, however, comes a word of caution—this case has been pending in the courts for over two years. The Third Circuit Court of Appeals has already ordered that the parties proceed as quickly as possible. *United States v. Price, supra,* 688 F.2d at 215. In spite of that mandate, the case has still not moved as rapidly as it should and minimal discovery has been taken. Furthermore, a number of parties, Roche included, are still defendants in this action despite the fact that the government has not compiled a strong case against them.[14] Most important, however, is the unavoidable fact that the danger which exists at Price's Landfill is still present and it only gets worse with the passage of time. The ones who are suffering the most are those who have no direct part in this litigation, but probably have the greatest stake in the ultimate resolution: the residents of Atlantic City.

In light of the above-mentioned problems, the court feels compelled to set a strict timetable with respect to the discovery process. This timetable will be set forth in an appropriate order.

---

**14.** During an argument on the appropriate liability standard, then Congressman David Stockman, an opponent of broad ranging liability under the act, stated his fears regarding potential consequences:

"... some day down the road about a year from now they are going to receive a letter from a company in their district that has just received a $5 or $10 million liability suit from EPA that was triggered by nothing more than a decision of a GS-14 that some landfill, some disposal site somewhere, needed to be cleaned up and, as a result of investigation that his

office did, he found out that company in your district contributed a few hundred pounds of waste to that site thirty years ago.... [when EPA finds] that deep pocket, they will immediately go to court and sue that deep pocket, and then all the onus of the law, all of the burden will be on him to prove that he was not responsible...."

Cong.Rec.H 9466 (daily ed. Sept. 23, 1980). Though Stockman's concerns were not taken seriously by Congress at the time, this court does not want those concerns to materialize during this lawsuit.